**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

AARON THOMAS GATES,

Defendant-Appellant.

No. 06-2035

(D. New Mexico)

(D.C. No. 05-CR-1079 RB)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* FED. R. APP. P. 34(a)(2); 10TH CIR. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Aaron Thomas Gates appeals his conviction for conspiracy to possess marijuana and actual possession of marijuana with intent to distribute. He contends that the district court plainly erred in allowing Drug Enforcement

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Administration ("DEA") Agent Tenille Kinsey to testify regarding a previous conversation she had with Mr. Gates's codefendant in which the codefendant implicated Mr. Gates. Because Mr. Gates cannot establish plain error, we affirm his conviction.

## I. BACKGROUND

### A. The Checkpoint Stop

On February 16, 2005, Border Patrol Agent Daniel Romero was on duty at the Interstate 25 checkpoint located north of Las Cruces, New Mexico, when a gray Honda Accord with Oklahoma plates drove through the checkpoint. Agent Romero yelled at Mr. Gates, the driver, to stop. Mr. Gates was traveling from Arizona with his friend Juan Yanez. After Mr. Gates stopped the car, Border Patrol Agent Florencio Montellano's drug-detecting canine alerted to the trunk of the car.

Agent Romero asked Mr. Gates if he was carrying anything in the trunk, and Mr. Gates replied he was not. Mr. Gates consented to a search of the trunk. When Agent Montellano opened the trunk, he testified that a strong odor of marijuana was present. Agent Montellano found three bundles of marijuana, two inside a duffel bag. The duffel bag was inscribed with "Gates, U.S.M.C., United States Marine Corps." Rec. vol. III, Tr. at 26-27. The agents also found a loaded .357 magnum revolver in the trunk.

At the time of his arrest, Mr. Gates was a cadet in the University of Oklahoma Army ROTC program. He had served in the United States Marine Corps, was about to start on another military career as an officer in the Army. Having completed the Reserve Officer Training Program, he was to start Officer Training School on April 11, 2005. Mr. Gates, who had been commissioned as a second lieutenant in the Army on December 17, 2004, wore his military camouflage uniform, although he was neither on military orders nor on the Army's payroll at the time of the arrest.

Mr. Gates was employed part-time as a security guard. According to his testimony, he was scheduled to stop that job and to go on active duty in the Army on February 21, working as a campus recruiter.

B. Mr. Gates's Post-Arrest Statements

Agent Montellano testified that, in a post-*Miranda* interview, Mr. Gates told him that he knew the marijuana was in the vehicle, but claimed that it did not belong to him. According to Agent Montellano, Mr. Gates also admitted that he let Mr. Yanez load it into his car.

DEA Special Agent Kinsey testified that she responded to the call at the checkpoint and interviewed Mr. Gates and Mr. Yanez. According to her testimony, Mr. Gates told Agent Kinsey that Mr. Yanez asked him if he would help drive the vehicle from Oklahoma to Tucson to pick up the marijuana in exchange for $1,500. Mr. Gates admitted that the revolver found in the vehicle

belonged to him. Mr. Gates also told Agent Kinsey that his wife had left three weeks before and that they had financial problems.

During direct examination, Agent Kinsey was asked if she had submitted the marijuana bundles for fingerprint analysis. *Id.* at 46. Agent Kinsey said that she had not done so. When asked why not, Agent Kinsey responded: in"Because I had two conversations. I knew who the dope—the marijuana belonged to. I didn't need to fingerprint it." *Id.* The prosecution then asked "did Mr. Gates or Mr. Yanez claim to loading the marijuana?" Agent Kinsey responded, "No. They did not." *Id.*

C. Mr. Yanez's Trial Testimony

Mr. Yanez testified that about a week before the arrest, he made arrangements with another friend to pick up a load of marijuana in Tucson. According to Mr. Yanez, he had been friends with Mr. Gates for three years and that he trusted Mr. Gates more than any of his other friends. Mr. Yanez testified that he decided to ask Mr. Gates to drive him to Tucson to pick up the marijuana. At the time, Mr. Yanez did not have a vehicle or a driver's license. Mr. Yanez told agents he was to be paid about $3,000, but at trial he testified he expected to be paid $1,500 to transport the load of marijuana. He planned to split the money with Mr. Gates.

Mr. Yanez testified that Mr. Gates picked up Mr. Yanez in Oklahoma City on the afternoon of February 15, 2005. When they arrived in Tucson, Mr. Gates

and Mr. Yanez took the vehicle to a shopping center where it was picked up and loaded by a person named "Dinken." *Id*. at 75-77. Neither Mr. Yanez nor Mr. Gates were present when the vehicle was loaded.

D. The Written Statement Signed by Mr. Yanez

During a court proceeding after their arrest, Mr. Gates gave Mr. Yanez a written statement and asked him to sign it. The statement said that Mr. Gates did not know about the marijuana until they arrived at the checkpoint and that at no time before the border stop did Mr. Gates have any knowledge about the presence of marijuana in his car. Mr. Yanez testified that if he signed the statement, he thought Mr. Gates would take responsibility for the gun found in the car. Mr. Yanez signed the document, which was admitted at trial.

E. Mr. Gates's defense

In addition to cross-examining the government's witnesses, defense counsel presented evidence that Mr. Gates drove his friend to Arizona because he thought Mr. Yanez was considering purchasing a vehicle there. Mr. Gates testified he was planning to visit his sister in Phoenix, and, on redirect, Agent Kinsey recalled some mention of a sister there. Mr. Gates also clarified that he did know about the marijuana, but not before Mr. Yanez told him about it at the checkpoint. Mr. Gates testified in his defense, as did his then-separated spouse, and both testified about Mr. Gates's clean record and the unlikelihood that Mr. Gates would be

involved in the scheme, given the relatively small amount of money and the high risk of tarnishing his record.

E. Procedural background

A federal grand jury indicted Mr. Gates and Mr. Yanez for conspiracy to possess with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 846, and for possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(D). The grand jury also indicted Mr. Gates for carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(I). Mr. Yanez pleaded guilty to the charges.

Before the case was submitted to the jury, the district court granted Mr. Gates's motion for judgment of acquittal on the firearm charge. The jury convicted Mr. Gates on both the drug charges. The district court sentenced Gates to 21 months' imprisonment, a sentence six-months below the low end of the guideline range. Mr. Gates now timely appeals.

## II. DISCUSSION

Mr. Gates raises one contention on direct appeal: that Agent Kinsey's testimony improperly referred to a prior consistent statement made by Mr. Yanez. Because Mr. Gates failed to raise this argument at trial, we review for plain error. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public

reputation of judicial proceedings." *United States v. Bowen*, 437 F.3d 1009, 1021 (10th Cir. 2006) (internal quotation marks omitted).

*Tome v. United States*, 513 U.S. 150, 155-166 (1995), provides that prior consistent statements offered to rebut a charge against the declarant of recent fabrication are only admissible under Federal Rule of Evidence Rule 801(d)(1)(B) if the declarant made the statements before the alleged motive to fabricate arose. We agree with Mr. Gates that it may be possible to infer the nature and substance of Agent Kinsey's previous conversation with Mr. Yanez. However, we need not decide whether the previous conversation violated Fed. R. Evid. 801(d)(1)(B) because Mr. Gates cannot establish that any error affected his substantial rights.

For this reason, we hold that even assuming arguendo that Mr. Gates could meet the first two prongs of plain error analysis, he has failed to show that the impact of the district court's alleged error affected his substantial rights. As the Supreme Court noted in *United States v. Olano*, in most cases the determination that an error has affected substantial rights "means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." 507 U.S. 725, 734 (1993). "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.*

Mr. Gates has failed to show that Agent Kinsey's testimony regarding a previous conversation affected the jury's verdict. Not only did Agent Kinsey testify that Mr. Gates told her he knew of the presence of the marijuana, but also

Border Patrol Agent Montellano testified that, while he was processing Mr. Gates, Mr. Gates told him that he knew about the presence of marijuana. In addition, Mr. Yanez testified as to Mr. Gates's involvement in the conspiracy and of his knowledge of the presence of marijuana that was in Mr. Gates's own duffel bag. There was more than sufficient evidence supporting his conviction.

Furthermore, Mr. Gates's counsel had every opportunity to cross-examine the prosecution's witnesses, and indeed, thoroughly did so. In particular, defense counsel cross-examined Mr. Yanez regarding his signed statement accepting responsibility for the marijuana, and stressed that Mr. Gates's only knowledge of the marijuana was after Mr. Yanez told him it was in the car.

The jury considered all of the above evidence, credited the prosecution's witnesses, and found Mr. Gates guilty. Given the amount of evidence against him, Mr. Gates cannot establish that any error affected his substantial rights.

### III. CONCLUSION

Accordingly, we AFFIRM Mr. Gates's conviction.

Entered for the Court,


Robert H. Henry
Circuit Judge